Linda S. **TREADWAY**, Personal Representative of the Estate of Richard A.C. Treadway, Deceased, Plaintiff,

v.

**SMITH & WESSON CORP.**, Defendant.

No. 95–CV–75801–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Oct. 25, 1996.

Linda Baxter, Utica, MI, for Plaintiff.

Anne Kimball, Chicago, IL, for Defendant.

### OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

## I. INTRODUCTION

Plaintiff Linda Treadway, as the personal representative of the estate of Richard A.C. Treadway, her son, commenced this action in Wayne County Circuit Court on October 12, 1995 against Defendant Smith & Wesson Corporation arising out of the accidental shooting death of her 14–year–old son Richard by his friend Jason Michelsen. On November 28, 1995, Defendant removed this matter to this Court on the basis of diversity of citizenship. In her complaint, Plaintiff alleges that Defendant failed to properly design, manufacture, inspect, or test its .38 Caliber Model 36 revolver (the "revolver"), and, as well, failed to warn or instruct its users against dangers and failed to provide adequate safeguards.[1]

Presently before this Court is Defendant's motion for summary judgment, brought pursuant to Fed.R.Civ.P. 56(c). In this motion, Defendant argues that: (1) the open and obvious danger rule forecloses Plaintiff's neg-

---

1. This Court previously dismissed those portions of Plaintiff's complaint which: (1) requested for equitable relief in the form of a recall of the revolvers or a warning of the alleged defect to all owners of the revolvers; (2) claimed punitive and exemplary damages; (3) sought relief under 42 U.S.C. § 1983; and (4) requested damages for a range of personal expenses and suffering incurred in the death of her son.

ligence claims as a matter of law; and (2) Plaintiff has failed to establish a prima facia case of an unreasonable risk of foreseeable injury due to: (a) the inadmissibility of Plaintiff's expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and Fed.R.Civ.P. 702; (b) the inability of Plaintiff to have its expert qualified as an expert under F.R.E. 702. Plaintiff responds that: (1) The revolver did create an unreasonable risk of foreseeable injury; and (2) The "open and obvious danger" rule is just one factor to consider in determining whether a product creates an unreasonable risk of foreseeable injury, or alternatively, that the rule does not apply at all to design defect claims.

Having reviewed Defendant's Motion and supporting briefs, Plaintiff's Response, and having conducted a hearing on the motion, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

## II. *FACTUAL BACKGROUND*

On the afternoon of November 1, 1993, Richard Treadway and his friend Jason Michelsen were at the Michelsen residence, without any adult supervision. Both boys were 14 years-old at the time. As he had on at least one prior occasion, Jason, without any adult permission or supervision, removed his father's loaded revolver from its unsecured location on top of an entertainment center in the family living room, and went to his bedroom. Jason's father, a Detroit Police Officer, had purchased this revolver and kept it loaded at the Michelsen residence as his off-duty police weapon.

When Jason took the revolver to his bedroom, he opened the cylinder and attempted to empty the bullets by shaking the revolver twice. He apparently failed as one bullet remained in the cylinder. While Jason was walking from his bedroom into the hallway,

he pulled the hammer back, uncocked the trigger, and continued holding the revolver while looking at it and "fiddling" with it.

It was at this time that the revolver allegedly moved into the "hang-up position". In this position, the revolver is cocked and the hammer is lowered so that it catches and stops at a position in which the revolver's user could be fooled into thinking that the hammer is lowered all the way down to a safe position.[2]

When Jason was in the hallway "fiddling" with the revolver, he pointed the revolver in Richard's direction and continued to hold and look at the revolver. Seconds later, the revolver discharged and fired a bullet which struck Richard in the head above the left eye and eventually caused his death. After loading the revolver with an additional bullet, raising the revolver to his own head, and contemplating his own suicide, Jason placed the revolver in the hallway and called "911". Shortly thereafter, police and emergency personnel arrived at the Michelsen residence.

Whether Jason pointed the revolver at Richard or just accidentally aimed it in his direction, and whether Jason pulled the trigger or just squeezed it or touched it, are matters that appear to be in some dispute. The uncertainty arises due to inconsistencies between Jason's statements to the police, Jason's statements during his deposition, and Plaintiff's response to Defendant's summary judgment motion.

According to the responding officer at the scene, Jason stated that he and Richard were playing cops and robbers and that during the course of this, (Defendant's Ex. 6, pg. 20), Jason pointed the gun at Richard and pulled the trigger. (*Id.* at 15). However, while making his statement to the police at the police station, Sgt. Ronald D. Gale ("Gale") asked Jason, "What exactly was Richard doing when you pointed the gun at him?" (Defendant's Ex. 9, pg. 4). Jason answered,

---

**2.** Defendant's expert has stated that the revolver can be discharged in two ways: (1) a long trigger pull which both cocks the hammer and releases it (double action mode), or by manually drawing the hammer to the rear to cock and then pulling the trigger (single action mode). Plaintiff's expert, while agreeing that these two methods are possible, contends that the revolver may be discharged a third way: when the revolver is in the "hang-up position". Plaintiff's expert alleges that when the revolver is in the "hang-up position", the same slight amount of pressure on the trigger as is needed to fire the revolver from a single action mode, may also fire the revolver.

"Richard had the gun in his mouth and he just turned his head a little bit to look straight at me." Next, Gale inquired, "Why did you point the gun at Richard?" To which Jason responded, "It was just a joke, he [Richard] had said something about not being scared." *Id.* In an earlier part of his statement, Jason had explained, "I was telling [Richard] a story about how somebody was looking through our window on Halloween night [the evening previous to the day of the shooting] and it kind of scared us [Jason and his mom]," (Defendant's Ex. 9, pg. 4 and Defendant's Ex. 4, pg. 31); to which Richard responded that not much scared him on Halloween.

Shortly after Richard had said this, the following events transpired, according to Jason's statement to Gale:

I raised the gun and pointed it in Richard's direction. I didn't have my finger on the trigger, I had it on the trigger guard. I brought my finger in on the trigger, and I was about to take my finger off. I guess I must have squeezed too hard, and the gun went off.

(Defendant's Ex. 9, pg. 2).

In May 1994, after Jason had pled guilty to careless use of a firearm resulting in injury or death, Plaintiff approached Roy Michelsen, Jason's father and her social friend and neighbor, about meeting with Mr. Garvey, Plaintiff's lawyer. (Defendant's Ex. 2. pg. 16). Plaintiff suggested this meeting to Roy Michelsen because Mr. Garvey had explained to her how a problem with the Smith & Wesson revolver could possibly show that Richard's shooting was not entirely Jason's fault. (Defendant's Ex. 2, pp. 16–20). Shortly thereafter, Roy Michelsen met with Mr. Garvey and Plaintiff, at which time Mr. Garvey and Plaintiff explained to him how the "hang up position" could have been responsible for the revolver discharging. (*Id.*)

After this meeting, Mr. Garvey met with Jason during July and/or August of 1994. (Defendant's Ex. 2, pp. 29–38). At the first meeting, Mr. Garvey told Jason that there was a problem with the revolver. (Defendant's Ex. 4, pg. 135). At a second meeting, Mr. Garvey had the revolver in his office and as he was explaining the "hang up position"

and how to manipulate the revolver into that position, Jason began "messing with" the revolver and himself manipulated the revolver into the "hang up position". (*Id.* at 136–39). Further, Mr. Garvey told Jason that when the revolver was in this position, it would fire without the trigger being pulled. (*Id.* at 137). According to Jason, this visit to Mr. Garvey's office was the first time that he had heard of the "hang up position" and the first time that he had seen the revolver manipulated into such a position. (*Id.* at 146).

On February 7 and 22 of 1996, Jason was deposed in this case. Jason's statements during the deposition differed in several respects from his statements to the police. First, when asked if he raised the gun and pointed it in Richard's direction, Jason responded that he "[n]ot so much pointed it. I raised the gun and the way I was looking at it, it was pointed in the general direction. But it's not like I actually picked it up and pointed it at him." (Defendant's Ex. 4, pg. 43). Second, when asked why he was holding the revolver out like that, Jason answered, "I was just looking at it." (*Id.* at pg. 114). Further, when asked if he was trying to scare Richard, Jason said, "No." (*Id.*) Finally, as for the shooting itself, Jason stated that his finger was on the trigger guard and not on the trigger, although he may have moved it to the trigger, but did not recall, (Plaintiff's Ex. A, pg. 47), and that as he was looking at the revolver, he noticed that something did not look right and then the revolver fired. (*Id.* at 42–44).

Compounding these inconsistencies is Plaintiff's expert, Lama Martin. When Mr. Martin was asked, "Would you agree with me that even when the gun is in the hang-up position, you still have to pull the trigger to get it to fire?", he responded, "The ones I've tested you do, yes." Further, Mr. Martin also stated that it was his opinion that "... the trigger was pulled in some fashion." (Defendant's Ex. 3, pg. 10).

Apparently in an effort to clarify her position, Plaintiff has offered a conflated explanation of these matters in her response to Defendant's motion for summary judgment.

Specifically, in this response, Plaintiff's Statement of Facts admits that although Jason put "slight pressure on the trigger", he did not intentionally pull the trigger. Further, in the argument section, Plaintiff admits that this "slight touch of the trigger" is the "same slight amount of trigger pressure needed to fire [the revolver] from a single action mode."

Based on Plaintiff's statements in her response and the various depositions and statements to the police, Plaintiff has admitted, at the very least, that while Jason Michelsen was "fiddling with" the hammer of his father's loaded and cocked revolver, he pointed it in the direction of Richard Treadway and applied enough pressure to the trigger to make the revolver fire from a single action mode. As a result of these actions, Richard Treadway was shot and killed.

### III. ANALYSIS

#### A. The Standards Applicable to Motions for Summary Judgment.

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[3] According to the *Celotex* Court,

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

■ After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

★ Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

★ The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

★ The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

★ The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

★ The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

---

**3.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."

10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also, Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994).

### B. *Manufacturers of Simple Tools Such as Guns Have No Duty to Design Safety Features or Promulgate Warnings to Protect Users from Dangers That Are Open and Obvious Due to the Tool's Inherent Nature.*

Plaintiff's complaint alleges that Defendant negligently designed the revolver without a manual safety guard and negligently failed to warn users of the revolver's consequent danger because a user can fire the revolver from the "hang-up position". A federal court sitting in diversity, as this Court is, must ordinarily apply the applicable and controlling state substantive law. *See, e.g., Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Thus, this Court must apply the substantive law of the State of Michigan to Plaintiff's claims.

#### 1. *A Manufacturer's Duty under Michigan Law.*

▮ In Michigan, "[a]ctionable negligence presupposes the existence of a legal relationship—in other words, a duty." *See, e.g., Clark v. Dalman*, 379 Mich. 251, 150 N.W.2d 755 (1967). Accordingly, when a plaintiff sues the manufacturer of a product for the manufacturer's negligent design or failure to provide warnings, the plaintiff's prima facie case must demonstrate that the defendant manufacturer owed the plaintiff a duty of care. *See, e.g., Glittenberg v. Doughboy Recreational Industries*, 441 Mich. 379, 385, 491 N.W.2d 208, 211 (1992). Whether this duty exists is a question of law for the Court to decide. *See, e.g., Smith v. Allendale Mutual Ins. Co.*, 410 Mich. 685, 713–15, 303 N.W.2d 702 (1981). When a court finds no manufacturer's duty to the plaintiff in a products liability case, summary judgment for the defendant is appropriate as a matter of law. *See, e.g., Moning v. Alfono*, 400 Mich. 425, 254 N.W.2d 759 (1977); *Fisher v. Johnson Milk Co., Inc.*, 383 Mich. 158, 174 N.W.2d 752 (1970).

#### 2. *The Evolution, Current Status, and Applicability of the Michigan Open and Obvious Danger Rule.*

▮ As a matter of Michigan law, an open and obvious danger associated with the use of a product which is a "simple tool" will obviate the manufacturer's products liability duty to warn and/or protect. *See, e.g., Kirk v. Hanes Corp.*, 16 F.3d 705, 710–11 (6th Cir.1994); *Fisher*, 383 Mich. at 160, 174 N.W.2d at 753. Although other courts have, at times, doubted the vitality of this rule, first announced in *Fisher*, the Sixth Circuit in *Kirk* has determined that in Michigan the "open and obvious danger" rule applies in both failure to warn and design defect products liability cases where the product is a simple tool.[4]

The Michigan Supreme Court first articulated the open and obvious danger rule in *Fisher*, a failure to warn and design defect products liability case. In *Fisher*, the plaintiff, an attorney, purchased from the defendant a wire bottle carrier made to carry four half-gallon bottles of milk. Some time later, after purchasing milk, and while walking to his house and holding the carrier containing the bottles of milk in his right hand, he slipped and fell on some ice, causing the bottom of the carrier to hit the sidewalk and the bottles to break. Plaintiff attempted to break his fall and his palm landed on pieces of a broken bottle, cutting and causing a severe injury to his hand.

Plaintiff sued defendant under two theories: negligent failure to warn and breach of implied warranty of merchantability/fitness for ordinary use. The trial court granted the defendant's motion for summary judgment on both counts and the Michigan Supreme Court affirmed, holding:

> There was no inherent, hidden or concealed defect in the wire carrier. Its manner of construction, how the bottles would rest in it, and what might happen if it were dropped, upright, on a hard surface below, with the possibility that the contained bottles might break, *was plain enough to be seen by anyone* including a patent attorney

---

4. This conclusion may also be supported by the Michigan Court of Appeals decision in *Adams v. Perry Furniture Co.*, 198 Mich.App. 1, 497 N.W.2d 514 (1993), *lv. denied* 445 Mich. 901, 519 N.W.2d 860 (1994). *See* discussion at pp. 1333–34, *infra.*

as well as a milk dealer. *There is no duty to warn or protect against dangers obvious to all.*

383 Mich. at 160, 174 N.W.2d at 753 (*emphasis* added).

■ This language has evolved into what has come to be known as the "open and obvious danger" rule, which relieves manufacturers of liability on certain design defect and failure to warn claims. The rule arose out of the Michigan Supreme Court's recognition that any product, regardless of its type or design, is capable of producing injury and no manufacturer is required to make his product accident proof or fool proof. *Fisher,* 383 Mich. at 160, 174 N.W.2d at 754. As the *Fisher* Court explained in creating the rule,

> We have not yet reached the state where a manufacturer is under the duty [to protect and warn against a source of injury that is] manifestly dangerous.... In such cases, the very nature of the article gives notice and warning of the consequences to be expected of the injuries to be suffered....

*Fisher,* 383 Mich. at 162–63, 174 N.W.2d at 754 (quoting *Campo v. Scofield,* 301 N.Y. 468, 95 N.E.2d 802, 804 (1950)).

In an attempt to avoid the open and obvious danger rule, Plaintiff relies upon *Owens v. Allis–Chalmers Corp.,* 414 Mich. 413, 326 N.W.2d 372 (1982) and *Carlson v. Bic Corporation,* 840 F.Supp. 457 (E.D.Mich.1993). Essentially, Plaintiff argues that *Owens* makes the open and obvious danger rule only a factor in a broader risk-utility test for negligence and that *Carlson* correctly renders the rule applicable only to failure to warn cases. As the following discussion demonstrates, *Owens* does not apply to the instant matter, and *Carlson* is no longer persuasive authority because of the Sixth Circuit's subsequent decision in *Kirk,* 16 F.3d 705.[5]

In *Owens,* the Michigan Supreme Court affirmed a directed verdict in favor of a forklift manufacturer on the ground that the plaintiff had not proven that the lack of driver restraints presented an unreasonable risk of harm. In reaching this conclusion, however, the Court declined to hold that, simply because the lack of driver restraints was "open and obvious," the forklift manufacturer could not be liable under *Fisher. Owens,* 414 Mich. at 425–27, 326 N.W.2d 372. The applicability of *Owens* is limited, however, as the Sixth Circuit recently observed: "*Owens* ... focused on the manufacturer's alleged negligence in designing a forklift, a complex machine." *Kirk,* 16 F.3d at 708.

In *Kirk,* a child was injured when her brother set fire to her T-shirt with a butane lighter. Her mother brought suit alleging that Bic Corporation, the manufacturer of the lighter, had been negligent in failing to design a child-proof or child-resistant lighter and in failing to warn of the dangers of letting children have unsupervised access to its lighters. *Id.* at 706. In affirming the district court's granting summary judgment for Defendant Bic, the Sixth Circuit held that when the dangers of a simple tool are obvious and inherent in the product's utility, a manufacturer is not required to design safety features to protect users from these dangers, *Id.* at 710, or to promulgate warnings to alert users to these dangers, *Id.* at 706.

As the *Owens* Court itself noted, "[o]ur Court of Appeals has essentially limited language in our decision in *Fisher* by the fact that *Fisher* involved a simple product or tool. We believe that such a limitation is proper." *Owens,* 414 Mich. at 425, 326 N.W.2d at 377 (*emphasis* added). Relying on this language, the *Kirk* Court stated:

> Obvious risks presented by one aspect of a complex machine, such as the forklift in *Owens,* may or may not be unreasonable when considered in light of feasible alternatives, the utility of the product and the impact of proposed alternatives on its overall safety. This intricate balancing is, in the ordinary case, best left to the jury. Those cases, as the above-quoted language [in *Owens* ] makes clear, stand in stark contrast to cases such as *Fisher* in which the product is a simple tool that presents a

---

**5.** Although not of precedential significance, the *Carlson* decision may also be further undermined by the Michigan Supreme Court's denial of review in *Adams,* 198 Mich.App. 1, 497 N.W.2d 514 (1993), *lv. denied* 445 Mich. 901, 519 N.W.2d 860 (1994). *See* discussion at pp. 1333–34, *infra.*

single, obvious risk inherent in the product's utility. *Therefore, we read Owens as refusing to extend Fisher to design defect cases involving complex machines....*

*Kirk,* 16 F.3d at 708–09 (citations omitted) (*emphasis* added).

Accordingly, *Kirk* and *Fisher* are controlling authority for this case, and not *Owens,* because the instant matter involves a gun, which the Sixth Circuit has determined to be a "simple tool". In fact, when the Sixth Circuit was deciding the *Kirk* case, the Sixth Circuit stated that "simple tools" include:

> [k]nives, *guns,* blenders, saws, drills: the list of helpful tools perfectly safe in adult hands but dangerous in the hands of unsupervised children is endless. In all of these cases, the utility of the tool is high and the probability of harm is virtually nil when the child is properly supervised.... When the risk of harm is so low, and requires misbehavior on the part of supervising adults to occur, we cannot hold a manufacturer has acted unreasonably.

*Kirk,* 16 F.3d at 710, n. 5 (quoting *Byler v. Scripto–Tokai Corp.,* Nos. 90–6112, 90–6113, 1991 WL 181749 (6th Cir. Sept. 7, 1991) (unpublished) (*emphasis* added)).

At first glance, however, Plaintiff's argument may receive some support from dicta in the Michigan Supreme Court's decision in *Glittenberg.* In *Glittenberg,* Plaintiffs brought actions against the manufacturers and sellers of above-ground swimming pools, seeking damages for head injuries and paralysis suffered when plaintiffs, in separate incidents, dove headfirst into shallow water. 441 Mich. 379, 384, 491 N.W.2d 208, 210. The issue on appeal to the Michigan Supreme Court was whether summary disposition was properly granted in favor of the defendant manufacturers and sellers on the basis that they had no duty to warn of the danger of a headfirst dive into the shallow water of an above-ground pool, which the parties agreed was a "simple tool". *Id.* The Court held that manufacturers and sellers had no duty to warn in this case because the product was a simple tool and the danger was open and obvious. *Id.* at 395–96, 491 N.W.2d 208.

Nonetheless, in dicta, the Court also discussed the open and obvious danger rule with respect to design defects. Here, the Court stated:

> [o]ur jurisprudence recognizes the well-established rule that there is no duty to warn of dangers that are open and obvious. We have also narrowed application of the no-duty rule to those cases involving "simple tools or products." We have rejected the proposition that the "open and obvious danger" rule is an incantation that obviates the threshold inquiry of duty in design defect cases.

*Glittenberg,* 491 N.W.2d at 214 (citations omitted).

In *Kirk,* the Sixth Circuit quoted this excerpt and explained:

> We are not convinced that this language conflicts with our understanding that *Fisher* remains a viable theory of defense in design cases involving simple tools. The *Glittenberg* [C]ourt's citation to *Owens* as having limited the open and obvious danger rule, we believe, indicates that the limitation extends only to complex tools such as the forklift in *Owens.* Specifically, the second sentence in the quoted passage seems to us to support, rather than weaken, our conclusion that *Fisher* remains viable in design defect cases involving simple tools.

*Kirk,* 16 F.3d at 709.

Nonetheless, the *Glittenberg* Court, in further dicta, also stated that:

> [i]n the design defect context, obvious risks may unreasonably breach the duty to adopt a design that safely and feasibly guards against foreseeable misuse. Because the manufacturer's liability for choice of design is not determined solely by looking at the obvious nature of the alleged defect, the obviousness of the danger does not preclude the possibility that an alternative design could reduce the risk of harm at a cost and in a manner that maintains the product utility.

*Id.* at 394, 491 N.W.2d 208. Once again, however, the Court relied upon *Owens.* As discussed earlier, *Owens* affirmed *Fisher* and annunciated a different approach only with respect to complex tools. Indeed, the Sixth

Circuit in *Kirk* explicitly endorsed this reading of *Owens*. Consequently, this discussion in *Glittenberg* is properly limited to complex tools.[6]

■ Accordingly, this Court will follow the holdings of *Owens*, *Fisher*, and *Kirk* and will not perform the *Owens* risk utility test where a plaintiff alleges a design defect negligence claim against the manufacturer of a simple tool.

Alternatively, Plaintiff argues that the open and obvious danger rule does not apply at all to design defect cases involving simple tools, relying on *Carlson*. In *Carlson*, a disposable butane lighter caused a house fire that killed three children. 840 F.Supp. at 459. The plaintiff claimed that the lighter was defective because it did not contain a child safety lock. *Id.* at 460. The defendant moved for summary judgment relying upon the open and obvious danger rule. *Id.* at 459.

Initially, the Court granted this motion as to all claims, which included negligence in breach of duty to warn, negligence in design defect, breach of implied and expressed warranties, reckless and wanton misconduct, and violation of the Consumer Product Safety Act. *Id.* However, in ruling on a motion to reconsider, the Court granted the motion to reconsider as to the plaintiff's design defect claim and denied it as to all other claims. *Id.* To justify this ruling, the court explained,

> [t]his Court believes that the court in *Fisher*, upon whose reasoning the two federal district courts in [*Raines v. Colt Industries, Inc.*, 757 F.Supp. 819 (E.D.Mich. 1991) and *Kirk v. Hanes Corp.*, 771 F.Supp. 856 (E.D.Mich.1991) ]—as well as the Michigan Court of Appeals in *Adams*—relied, confused duty to warn analysis with design defect analysis.

*Id.* at 463.[7] The Sixth Circuit, however, reached a different result in *Kirk*. In *Kirk*, the Court specifically stated that it read *Owens*, 414 Mich. 413, 326 N.W.2d 372 (1982), as "acknowledging *the continued validity of Fisher in design defect [and failure to warn] cases arising out of the use of simple tools.*" *Kirk*, 16 F.3d at 708–09 (*emphasis* added).

Given that *Carlson*, a 1993 Michigan district court diversity case, predates the controlling authority of *Kirk* and may be inconsistent with the Michigan Court of Appeals decision in *Adams*, Plaintiff's reliance on *Carlson* and her request that this Court follow *Carlson* is not well taken. The Sixth Circuit has, relying on *Fisher*, *Owens*, and *Adams*, held that the open and obvious danger rule applies to both design defect and failure to warn claims sounding in negligence where the product at issue is a simple tool. Accordingly, this Court will do the same.

---

**6.** Similarly, Plaintiff's argument that this Court should apply a risk-utility test to the design defect claim is not, upon close reading, supported by the Michigan Court of Appeals decision in *Adams v. Perry Furniture*, 198 Mich.App. 1, 497 N.W.2d 514 (1993), *lv. denied*, 445 Mich. 901, 519 N.W.2d 860 (1994). In *Adams*, the plaintiffs brought claims alleging, in relevant part, negligent design and failure to warn against Bic Corporation. *Adams*, 497 N.W.2d at 515. On the failure to warn claim, the Court applied the open and obvious danger rule and concluded that "Bic had no duty to warn children with respect to the obvious danger of its lighters because such danger is no danger to the reasonably careful person." *Id.* at 520. However, when discussing the design defect claim, the Court noted that "[o]bviousness of danger, however, is merely one factor in the analysis of whether a design is reasonable" because "[t]he test in design defect cases concerning simple tools is whether the risks are

unreasonable in light of the foreseeable injuries." *Id.* (citing *Owens*).

Nevertheless, the Court affirmed summary judgment on the design defect claim because the Court was "not persuaded that the risk of this danger imposes a duty upon the manufacturer of the lighter to make it child-resistant in light of the fact that the product is intended to be sold to adults." *Id.* Thus, it seems that while the Court stated it was following *Owens*, it in fact applied *Fisher*. Indeed, the Sixth Circuit in *Kirk* discussed *Adams* and observed that the Michigan Court of Appeals in *Adams* had, on the basis of *Fisher*, determined that defendant Bic should prevail in summary judgment on the design defect claim pursuant to the doctrine that the danger of the lighter was open and obvious to the intended adult users. *Kirk*, 16 F.3d at 708.

**7.** Based on this quote, it appears that the *Carlson* Court also believed that *Adams* was following *Owens* in name only, and in fact, applied *Fisher*.

**C.** *Under the Michigan Open and Obvious Danger Rule, Defendant Smith & Wesson Cannot Be Held Liable and Is Entitled to Summary Judgment.*

Plaintiff's complaint alleges that Defendant Smith & Wesson was negligent in the design and manufacture of its .38 Caliber Model 36 revolver because: (1) the revolver may fire from "the hang-up position" without the user intentionally pulling the trigger and (2) in light of this possibility, Smith & Wesson still did not include a manual safety guard on this revolver. Further, because Defendant did not warn users of this possibility, Plaintiff complains that Defendant also negligently failed to warn.

These negligence claims, as discussed earlier, arise from the following incident, as admitted in Plaintiff's response to Defendant's motion for summary judgement. While 14-year-old Jason Michelsen was, without adult permission or supervision, "fiddling with" the hammer of his father's loaded and cocked revolver, he pointed it in the direction of Richard Treadway and applied enough pressure to the trigger to make the revolver fire from a single action mode. As a result of these actions, Richard Treadway was shot and killed. Under the Michigan open and obvious danger rule, Defendant cannot be liable in these circumstances.

In addition to the Sixth Circuit's decision in *Kirk* and the Michigan Court of Appeals decision in *Adams, Raines v. Colt Industries, Inc.,* 757 F.Supp. 819 (E.D.Mich.1991), decided by Judge Zatkoff of this Court, is instructive in reaching this conclusion. In *Raines,* two teenagers were "pushing each other around and playing" while a loaded handgun laid on the ground in their immediate vicinity. *Id.* at 822. Shortly thereafter, while continuing to play around, one of the teenagers decided to scare his friend with the handgun. *Id.* Specifically, he removed the ten-round clip from the pistol and apparently failed to realize that one round remained in the firing chamber. *Id.* He then pointed the gun at his friend, whose back was to him, and he "clicked" the gun. *Id.*

Unfortunately, the "click" caused the gun to discharge a bullet which fatally struck his friend in the back of the head. *Id.* As a result of this incident, the deceased's mother brought a claim against the handgun manufacturer, alleging negligent design and manufacture and negligent failure to warn because the gun had an eleven cartridge capacity, which made it possible for the gun to be loaded even though the ten-round clip had been removed. *Id.* Thus, the plaintiff argued that defendant's gun was defective because it lacked a magazine or clip disconnect safety device that would make it impossible for the gun to discharge after the clip had been removed. *Id.* at 823.

Judge Zatkoff in *Raines* held that, under Michigan law, a gun was a simple tool and that, under the open and obvious danger rule, the manufacturer had no duty to warn of or protect against known or obvious dangers associated with the use of a gun. *Id.* at 824. In reaching this result, the Court noted that "Michigan courts have defined an 'open and obvious danger' as a condition that would ordinarily be observed and the danger of which would ordinarily be appreciated by those who would be expected to use the product." *Id.* (citing *Glittenberg v. Doughboy Recreational Industries,* 436 Mich. 673, 695, 462 N.W.2d 348 (1990) (J. Griffin) (quoting Prosser & Keeton, *Torts* (5th ed.), § 96, pp. 686–87)). Furthermore, Judge Zatkoff stated that

> ... an open and obvious danger is determined by an objective standard; that is, an open and obvious danger is one of which a reasonable user should know: 'the open and obvious danger rule is not dependent on the subjective knowledge of a particular user. To adopt a requirement that persons voluntarily confronting open and obvious dangers must also be subjectively aware of each and every potential consequence of their action would be to effectively extinguish the doctrine itself.'

*Raines,* 757 F.Supp. at 823 (citing and quoting *Glittenberg,* 436 Mich. at 696, 462 N.W.2d 348 (J. Griffin)). This reasoning informs this Court and forms the back drop for this Court's decision.

In the instant matter, a loaded revolver clearly constitutes an open and obvious dan-

ger because while the utility of this simple tool is high when it is used properly, its potential to cause harm is great when it is used irresponsibly. In determining the inherent danger of the revolver at issue, this Court follows the approach of *Raines:*

> [because a remaining bullet in a five (5) hole cylinder would be] visible ... by casual inspection, an individual who would ordinarily be expected to use the gun, [an adult], would know upon inspection that a [bullet] remained in the firing chamber and was capable of being discharged. Thus, the Court concludes that a reasonable user would have recognized both the fact that the gun was loaded and the danger of firing the loaded gun at another person.

*Id.* at 825.[8] Indeed, as another court noted:

> [the user] deliberately picked [the gun] up, inserted his finger through the trigger guard, pointed it at the head of [the decedent] and pulled the trigger.... Only a defective person would fail to realize the obvious dangers associated with these actions.... A loaded firearm must be considered dangerous.... It is an instrument of death. That is its primary function.

*Taylor v. Gerry's Ridgewood, Inc.,* 141 Ill. App.3d 780, 95 Ill.Dec. 895, 490 N.E.2d 987 (1986).

Plaintiff attempts to distinguish the instant matter from *Taylor* and *Raines* because Jason Michelsen allegedly did not intentionally pull the trigger. Rather, he merely "fiddled" with the hammer of a loaded and cocked revolver, pointed it in the direction of his friend Richard Treadway, and applied "the same slight amount of pressure" to the trigger as "would be ... needed to fire [the revolver] from a single action mode."

This argument, however, ignores the objective and reasonable adult user standard that this Court must apply in this case, as a result, the Court finds that Plaintiff's distinction is one without legal significance. An objective and reasonable adult user of a cocked and loaded revolver would never·"fiddle" with the hammer and apply any pressure to the trigger while it was aimed in the direction of another person.

Accordingly, under the law of the State of Michigan, Defendant Smith & Wesson cannot be negligent for its design of the revolver or its failure to warn, based on the facts of this case. Therefore, since the Court has determined that Defendant owed no duty to Plaintiff as a matter of law, and has taken Plaintiff's facts on their face and still found no material issue of genuine fact, the Court must grant Defendant its motion for summary judgment.[9]

---

**8.** The point that Jason should have known that the revolver was not empty is not·in dispute, as is indicated by the following passage from Plaintiff's expert's deposition:

> Q: The bottom line is, it's up to the user to ensure that a gun is fully unloaded?
> A: Of this design, yes.
> Q: And would you agree that it's easy to verify that this particular revolver is unloaded?
> A: Sure.
> Q: .And would you also agree that a user of a handgun, any handgun, should always assume and treat the gun as if it were loaded?
> A. Yes.

(Defendant's Ex. 3, pg. 35).

**9.** The Court notes that because of this holding, it is unnecessary to address Defendant's argument that the design of the revolver presents no unreasonable risk of foreseeable injury under cases such as *Owens; Prentis v. Yale Manufacturing Co.,* 421 Mich. 670, 365 N.W.2d 176 (1984); and *Fisher v. Kawasaki Heavy Industries, Ltd.,* 854 F.Supp. 467 (E.D.Mich.1994).

Further, because the Court need not decide whether the revolver presents an unreasonable risk of foreseeable injury, the Court need not determine whether Plaintiff's expert's theory on the "hang-up position" and a manual safety fails to establish a prima facie case due to inadmissibility under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the controlling authority for the admissibility of expert testimony under F.R.E. 702. Moreover, the Court also need not decide whether Plaintiff's expert should or should not be qualified as an expert on firearm design. Nonetheless, the Court would observe that when a court qualifies a person as an expert,

> [s]pecific degrees, certificates of training or membership in a professional organization are not required. Included within the category of experts [under Rule 702] are what the Advisory Committee's Note refers to as 'skilled' experts, such as bankers or landowners testifying as to land value. The degree and manner of knowledge and experience required of the proffered expert is directly related to the complexity of the subject matter [here a simple tool] and the corresponding likelihood of error by one insufficiently familiar therewith. Overall the court must determine whether testimony by the wit-

## IV. CONCLUSION

Having concluded as a matter of law that the revolver in this case was a simple tool and the dangers presented by the revolver were open and obvious to an objective and reasonable adult user, the Court finds that Defendant did not owe Plaintiff a duty of care. Because no genuine issue of material fact exists, even when the facts are construed in Plaintiff's favor, and seeing as Defendant is entitled to judgment as a matter of law,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment be GRANTED.

ness as an expert will assist the trier of fact to understand the evidence or to determine a fact in issue.

M. Graham, *Federal Practice and Procedure: Evidence* § 6642, pp. 252–259 (1996 Interim Edition) (citations omitted). Finally, the Court also notes that

[l]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert 'should not be required to satisfy an overly narrow test of his own qualifications.' The trial court has wide discretion in determining the competency of a witness as an expert with respect to a particular subject.

*Id.* at pp. 259–60 (citations omitted).