**Robert Paul MILLS, Plaintiff,**

v.

**CURIONI, INC., General Corrugated Machinery Co., Inc., Acme Corrugated Box Co., Inc., Hampton Industrial Services, Inc., Sun–Automation, Inc., and Officine Curioni, S.p.A, Defendants.**

**No. 01–CV–71540–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

Dec. 19, 2002.

Patrick J. Bruetsch, Esq., Birmingham, MI, for plaintiff.

Michael, V. Kell, Esq., Birmingham, MI, Mark A. Hypnar, Esq., Bloomfield Hills, MI, Witold Sztykiel, Esq., Corrine F. Shoop, Esq., Troy, MI, for defendant.

## OPINION AND ORDER REGARDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

This product liability action is presently before the Court on five motions for summary judgment filed by four of the Defendants, i.e., two motions filed by Officine Curioni, S.p.A., and one each filed by General Corrugated Machinery Co., Inc., Acme Corrugated Box Co., Inc., and Hampton Industrial Services, Inc.[1] Plaintiff has responded to all of these motions.[2]

---

1. The only other remaining Defendant, Sun–Automation, Inc., has not filed any dispositive motion. (Defendant Curioni (USA), Inc. was dismissed from this action by stipulation of the parties on July 17, 2002.)

2. Plaintiff had only responded to the June 3, 2002 motion and did not respond to any of the other four motions until December 2, 2002, *after* he was directed to do so by the Court.

Having reviewed and considered the Defendants' briefs and supporting documents, and having heard the oral arguments of counsel at the hearing conducted on December 5, 2002, the Court is now prepared to rule on the motions. This Opinion and Order sets forth the Court's ruling.

## II. *PERTINENT FACTS*

Plaintiff Robert Paul Mills is an employee of Plymouth Packaging Company. On July 30, 1998, while operating a Flexo–Folder–Gluer machine at Plymouth Packaging, Mr. Mills's right hand was crushed when the work glove he was wearing got caught in the feeder roller of the machine. The Flexo–Folder–Gluer machine fabricates flat sheets of corrugated cardboard material, then prints, scores, slots, glues and folds the material into finished cardboard box. Defendant Officine Curioni, S.p.A., ("Curioni") manufactured the machine at issue at its plant in Milan, Italy.

In 1992, General Corrugated Machinery Company ("General Corrugated"), a New Jersey company which both manufactured its own corrugated box machinery and sold other manufacturers' machinery, orally agreed to act as United States sales agent for Curioni.[3] In the fall of 1992, Defendant Acme Corrugated Box Company ("Acme"), a corrugated box producer in Pennsylvania, wanted to purchase a new Flexo–Folder–Gluer and submitted a purchase order on October 2, 1992 to Curioni through General Corrugated. Following some negotiation a deal was struck and in February 1993, a Curioni 2000 NT Flexo–Folder–Gluer was shipped directly from Curioni's Milan, Italy plant to Acme's plant in Bensalem, Pennsylvania. Curioni personnel installed the Flexo–Folder–Gluer at Acme's plant.

From 1993 to 1998, Acme employees used the Flexo–Folder–Gluer machine to produce corrugated boxes. In 1998, Acme decided it no longer needed the machine and decided to sell it as used equipment "as is, where is."

In June 1998, Plymouth Packaging (Plaintiff's employer) entered into a purchase agreement with Acme pursuant to which Plymouth contracted to purchase the Flexo–Folder machine "as is" from Acme for $485,000. General Corrugated was not involved in the sale between Acme and Plymouth.

Pursuant to the Acme–Plymouth Packaging contract, Plymouth Packaging was responsible for all disassembly, rigging, loading and shipping of the Flexo–Folder and all of its related parts.[4] Plymouth Packaging hired Defendant Hampton Industrial Services, Inc. to (1) travel to Pennsylvania to disassemble the Flexo–Folder; (2) transport the machine to Plymouth Packaging's Plymouth, Michigan facility;[5] (3) unload the Flexo–Folder; and (4) reassemble the machine at the Plymouth facility.

### The Flexo–Folder Gluer Machine

The Flexo–Folder–Gluer is a large machine comprised of multiple sections: (1)

3. General Corrugated is now defunct, having closed its doors in 2000. The corporation was legally dissolved on December 31, 2001. Because of insufficient remaining assets to pay legal fees, the company instructed its lawyers in October 2002 to cease its defense of this action. Therefore, on October 16, 2002, Kell & Lynch, P.C. filed a Motion to Withdraw as Counsel.

4. Additionally, as part of the deal to purchase the machine, Acme agreed to provide training to Plymouth Packaging personnel in Acme's Pennsylvania facility on the operation of the machine. Plaintiff Robert Mills took advantage of this training.

5. Hampton sub-contracted the actual transportation of the machine from Pennsylvania to Michigan to a common carrier but performed all of the other contractual duties—i.e., disassembly, loading, unloading and assembly of the machine—itself.

the feed section; (2) the print section; (3) the slotting section; (4) the die cutter; (5) the folder-gluer; (6) the stitcher; and (7) the counter-elector. Plaintiff's injury allegedly occurred while he was wiping debris off of the feed table of the feed section.

Two employee-operators operate the Flexo–Folder–Gluer. In order to operate the machine, one of the operators will stand between the two side guide bars located at the front end of the machine where the feed section is located. [*See* photographs at Ex. 1 of the Acme Brief and at Ex. J of the Hampton Brief.] This operator loads flat sheets of cardboard stock into the feeder hopper. *Id.* Once the cardboard stock is loaded into the feeder hopper, the feed wheels, located on the feed table, and suction from underneath the feed table, guide the cardboard stock underneath the feed bar into the feed rollers, and through the machine process. *Id.* The machine operator does not have to manually feed, guide or push the stock into the feeder rolls. He only has to place piles of cardboard stock on the feed table between the two guides; the machine then automatically pulls in the stock, piece by piece.

The Flexo–Folder–Gluer machine has eight to ten emergency stop buttons. One of these emergency stop buttons is located at the front end of the machine on the control panel to the left of the feeder hopper. [*See* Hampton Brief, Ex. J, second photo.]

### Plaintiff's Work Experience With Flexo–Folder–Gluer Machines

Plaintiff Robert Mills was hired by Plymouth Packaging in June 1996. Plaintiff testified that for nearly two years prior to his accident, he operated a Flexo–Folder–Gluer machine which was quite similar to the Curioni machine at issue. In fact, Plaintiff testified that when he went to Pennsylvania for training on the Curioni machine at the Acme facility, he told the Acme personnel that he really did not need training on the actual operation of the machine because he was already familiar with it from his operation of the older Flexo–Folder–Gluer machine. Following the installation of the Curioni machine at Plymouth Packaging, Plaintiff operated this machine for nearly three weeks prior to his accident.

### Circumstances Surrounding Plaintiff's Injury

Plaintiff testified that while operating the old Flexo–Folder–Gluer and the newer Curioni machine, he would notice cardboard scrap build up on the feed table to the left and right of where the cardboard stock was loaded into the feeder hopper. Plaintiff theorizes that this scrap build up was caused when the cardboard stock was cut by the machine in the slotting section, behind the feeder and printer sections, and then built up from the inside of the machine and up through the rollers onto the feed table. Plaintiff testified that it was his practice, both on the old and new machines, to use his hands to wipe the scrap from the feed table, so as to avoid the cardboard scrap from jamming the machine and causing a stoppage in production.

According to Plaintiff, three or four months prior to his accident, Plymouth Packaging began insisting that its workers wear gloves and goggles. Because of this, Plaintiff was wearing gloves at the time of his accident.

At approximately 6:30 a.m. on July 30, 1998, Plaintiff was working at the front end of the Curioni Flexo–Folder–Gluer machine, standing between the two side guide bars, and loading cardboard stock into the feeder hopper. As he did this, he began to notice scrap building up on the feed table, just to the right of the cardboard stock in the hopper. Plaintiff testified that he took his right hand and at-

tempted to sweep the scrap off of the feed table and down onto the ground. However, as he did this, he believes that his glove got caught in the feeder rollers, which caused his right hand to be pulled into the feeder rollers and crushed between them.

*Procedural History*

On April 19, 2001, Plaintiff filed the instant product liability action in this Court on the basis of diversity of citizenship against Curioni (USA), General Corrugated, and Acme. Plaintiff was subsequently granted leave to amend his complaint and on December 7, 2001, Mills filed his First Amended Complaint adding Hampton Industrial Services, Sun–Automation, Inc. and the Italian manufacturer, Officine Curioni, S.p.A. as party-defendants.

In his two-count First Amended Complaint, Plaintiff alleges that Defendants negligently and defectively designed and manufactured the Flexo–Folder–Gluer machine[6] and failed to warn users of the inherent danger in the operation of the machine and its feeding mechanism (Count I). He further alleges that Defendants are liable to him for breach of express and implied warranties (Count II). Discovery has now closed and four Defendants have moved for summary judgment.

### III. *DEFENDANTS' SUMMARY JUDGMENT ARGUMENTS*

Defendant Curioni, S.p.A., has filed two motions for dismissal and summary judgment. In its first motion, Curioni argues for entry of summary judgment in its favor claiming that, because Plaintiff failed to effectuate service of process on it within the 91–day time limit for doing so provided under the Michigan Court Rules, his Complaint against Curioni was dismissed by operation of law and may not be reinstated because the 3–year Michigan statute of limitations for product liability claims has now lapsed. In its second motion, Curioni argues that Plaintiff Mills should be deemed a "sophisticated user" of the Flexo–Folder–Gluer machine and that, because the risk of injury by placing one's hand in the pinch point area of the feed roller of this machine while it was in operation is an "open and obvious danger" and a matter of common sense, it should be absolved of liability for Plaintiff's injuries.

Defendant General Corrugated argues that Mills' failure to warn claim must be dismissed because Plaintiff admitted knowing of the obvious danger of placing his hand near or in the feeder rollers and further argues that Plaintiff's claims also fail because Plaintiff has failed to make out the statutory requirements for negligence and breach of warranty claims against a non-manufacturer seller.

Defendant Acme Corrugated Box Company similarly argues for dismissal of Plaintiff's claims against it because Plaintiff has not established any independent negligence on the part of this non-manufacturer seller nor has he made out the statutory requirements for his breach of warranty claims against Acme. Defendant Hampton is also a non-manufacturer defendant. Hampton, too, argues that Plaintiff has failed to make out any cause of negligence or breach of warranty action against it.

### IV. *DISCUSSION*

A. *STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT*

Summary judgment is proper " 'if the pleadings, depositions, answer to interrog-

---

**6.** Plaintiff's alleged design/manufacturing defect is the lack of guards around the loading area of the feeder unit of the machine and also over the vacuum portion of the machine that holds the pieces of cardboard stock for feed-in. [*See* Deposition of Plaintiff's expert, Samuel Sero, pp. 48–54.]

atories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[7] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

> * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

> * The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

> * The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir.1996). *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will apply the foregoing standards in deciding Defendants' Motions for Summary Judgment in this case.

**B. SERVICE OF PLAINTIFF'S FIRST AMENDED COMPLAINT UPON DEFENDANT CURIONI, S.p.A. WAS TIMELY**

■ As indicated, this case was initiated in this Court on the basis of diversity of citizenship. Fed. R. Civ. Pro. 4(m) allows a plaintiff 120 days from the date of filing of the complaint to serve the defendant. Here, Plaintiff's First Amended Complaint was filed on December 7, 2001. Therefore, pursuant to Rule 4(m), Plaintiff had until

---

**7.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A C. Wright, A. Miller, M. Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

April 6, 2002 to serve the defendants with summonses and copies of the First Amended Complaint. Defendant Curioni, S.p.A. was served on March 12, 2001, i.e., well within Rule 4(m)'s 120–day time limit.

Defendant Curioni, however, contends that because this is a diversity case, Plaintiff was required to serve Defendant within the 91–day time limit required in the Michigan Court Rules, not within the 120–day period allowed under Fed. R. Civ. Pro. 4(m). *See* M.C.R. 2.102(D).[8] Curioni further argues that because it was not timely served within Michigan's 91–day service period, Plaintiff's Complaint against it was dismissed without prejudice by operation of law on the 92nd day pursuant to M.C.R. 2.102(E).[9] Here the 92nd day was March 9, 2002, i.e., three days before service was effectuated on Curioni. Curioni maintains that although automatic dismissal under M.C.R. 2.102(E) is "without prejudice," thus, allowing for the re-filing of the complaint, any re-filing of the complaint after March 9, 2002 would be time-barred under Michigan's three-year statute of limitations for product liability claims.

In support of its contention that in diversity cases, the timeliness of service of process is governed by state law, Curioni relies principally upon *Ragan v. Merchants Transfer & Warehouse Co.*, 337 U.S. 530, 69 S.Ct. 1233, 93 L.Ed. 1520 (1949), *Walker v. Armco Steel Corp.*, 446 U.S. 740, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980), and *Eades v. Clark Distributing Co.*, 70 F.3d 441 (6th Cir.1995), *cert. denied*, 517 U.S. 1157, 116 S.Ct. 1545, 134 L.Ed.2d 649 (1996). Curioni argues that this line of cases establishes that state statutes and court rules governing service of process apply in federal diversity actions. Curioni misconstrues these cases.

The issue presented in each of these three cases was *not* timeliness of service of process, but rather when an action is deemed "commenced" for purposes of the applicable state statutes of limitations. The plaintiffs in each of these cases argued that when an action is "commenced" should be governed by federal law, specifically, Fed. R. Civ. Pro. 3, which provides, "A civil action is commenced by filing a complaint with the court." However, in all three instances, the applicable state law required something more than the filing of a complaint to "commence" an action.

*Ragan v. Merchants Transfer* involved a tort action under Kansas law which was governed by a two-year statute of limitations. Kansas at the time also had a statute which provided that an action was deemed "commenced" [for purposes of tolling statute of limitations] as to each defendant, on the date on which the summons was served upon him. Kan. Gen. Stats. 1935, § 60–308. If, however, the complaint was filed within the applicable period of limitations, the action was then deemed to have commenced from the date of filing of the complaint if the plaintiff

---

8. M.C.R. 2.102(D) provides:

A summons expires 91 days after the date the complaint is filed. However, within that 91 days, on a showing of good cause, the judge to whom the action is assigned may order a second summons to issue for a definite period not exceeding 1 year from the date the complaint is filed. If such an extension is granted, the new summons expires at the end of the extended period....

9. M.C.R. 2.102(E) provides:

(1) On the expiration of the summons as provided in subrule (D), the action is deemed dismissed without prejudice as to a defendant who has not been served with process as provided in these rules, unless the defendant has submitted to the court's jurisdiction. As to a defendant added as a party after the filing of the first complaint in the action, the time provided in this rule runs from the filing of the first pleading that names that defendant as a party.

serves the defendant within 60 days of the filing. *Id.*

*Walker v. Armco Steel* involved a product liability action under Oklahoma law that was subject to a two-year statute of limitations. Oklahoma law, like the Kansas law at issue in *Ragan,* does not deem an action "commenced" for purposes of the statute of limitations until service of the summons on the defendant. *See* Okla. Stat., Tit. 12 § 97 (1971). If the complaint is filed with the period of limitations, the action is deemed to have been commenced as of the date of filing of the complaint if the plaintiff serves the defendant within 60 days of the filing.

Because the states' laws at issue in both *Ragan* and *Walker* required not only that a complaint be filed but also that the defendants be served with summonses within 60 days of the filing of the complaint to "commence" an action, the Supreme Court determined that Kansas and Oklahoma's service requirements were "an integral part" of these states' statutes of limitations, and therefore, these state statutes, not Fed. R. Civ. Pro. 3, were controlling in determining whether the statutes of limitations were tolled.

The *Walker* Court, however, made clear that in most circumstances, "Rule 3 governs the date from which various timing requirements of the Federal Rules begin to run." 446 U.S. at 751, 100 S.Ct. at 1985. It is only when an issue arises with respect to the tolling of a state statute of limitations by the commencement of an action that a state law which requires something other than the mere filing of a complaint to commence an action will control. *Id.*

The Sixth Circuit applied *Walker* in *Eades v. Clark Distributing. Eades* involved a diversity automobile accident claim under Kentucky law. Under the Kentucky limitations statute, motor vehicle injury actions are subject to a two-year period of limitations. *See* Ky.Rev.Stat.

Ann. § 304.39–230. Under Kentucky law, however, an action is deemed commenced not at the time that a complaint is filed, but rather on the date that the first summons is issued. *See* Ky.Rev.Stat. Ann. § 413.250 and Rule 3 of the Kentucky Rules of Civil Procedure.

Arguing in opposition to a motion to dismiss on statute of limitations grounds, the plaintiffs in *Eades* claimed that the rule of *Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), should apply. In *Hanna,* the Supreme Court held that where there is a "direct collision" between a Federal Rule of Civil Procedure and state law, the Federal Rule should apply. *Id.* at 464, 85 S.Ct. 1136. The Sixth Circuit, however, noted that *Walker* post-dated *Hanna,* and in *Walker,* the Supreme Court specifically found no "direct" conflict between the Fed. R. Civ. Pro. 3 and a state law which requires something more than the mere filing of a complaint, and therefore, concluded that, in that context, the *Hanna* analysis did not apply. 70 F.3d at 443, quoting *Walker, supra,* 446 U.S. at 752, 100 S.Ct. at 1986.

With respect to the instant action, the issue is not when the action as "commenced." Indeed, in this respect, Michigan law is identical to Federal law. M.C.R. 2.101, like Fed. R. Civ. Pro. 3 provides, "A civil action is commenced by filing a complaint with the court." There is no additional requirement, such as service of process upon the defendant, to "commence" an action for statute of limitations purposes. Michigan case law is clear—suit is "commenced" for purposes of the statute of limitations, upon the filing of a complaint. *Buscaino v. Rhodes,* 385 Mich. 474, 481, 189 N.W.2d 202, 205 (1971). Therefore, the *Ragan/Walker* rule is inapplicable.

■ Furthermore, as indicated, Defendant Curioni's argument here is really not about when the action was commenced, but

rather it is only whether the timeliness of service of process upon it should be determined by State or Federal law. With respect to this issue, the rule of *Hanna v. Plumer* clearly controls. Here, Michigan law requires that a defendant be served within 91 days of the filing of a complaint. Federal law allows 120 days from the date of filing of a complaint for a plaintiff to effectuate service of process upon the defendant. As the Sixth Circuit explained in *Davis by Davis v. Jellico Community Hosp. Inc.*, 912 F.2d 129 (6th Cir.1990), "Federal courts are to apply state procedural rules in diversity cases only when the federal rules of procedure do not address the situation presented." *Id.* at 137, quoting *Hanna v. Plumer*, 380 U.S. at 470, 85 S.Ct. at 1143. *See also, Argentina v. Emery World Wide Delivery Corp.*, 167 F.R.D. 359 (E.D.N.Y.1996) (the provisions of Rule 4 are properly classified as procedural since they simply regulate the method and timing of service of process in the federal courts).

For all of the foregoing reasons, the Court finds no merit in Defendant Curioni S.p.A.'s argument for dismissal on untimely service of process grounds. Accordingly, Curioni's June 3, 2002 Motion for Dismissal and Summary Judgment will be denied. The Court will now turn to Defendants' various motions alleging "failure to state a claim" as the basis for summary judgment.

## C. PLAINTIFF HAS CONCEDED THAT HE HAS NO CLAIM FOR BREACH OF EXPRESS OR IMPLIED WARRANTIES.

As noted, in his First Amended Complaint, Plaintiff alleged two Counts, one for negligent/defective design and manufacture and failure to warn and a second count for breach of express and implied warranties. However, in his Response to General Corrugated's Motion for Summary Judgment, Plaintiff concedes that he has no evidence of any express warranty to him or his employer, and he further concedes that he has no evidence that his employer relied upon any implied warranty when it purchased the Flexo–Folder–Gluer machine. *See* Plaintiff's December 2, 2002 Response to General Corrugated's Motion for Summary Judgment, p. 7. *See also,* Plaintiff's Answers to General Corrugated's Requests for Admission, General Corrugated's Ex. M; Agreement for Sale of Machinery between Acme Corrugated and Plymouth Packaging, Hampton's ˙Ex. D, p. 2 (attesting that no warranties oral or written were made by Acme to Plymouth).

Plaintiff having admitted that he has no evidence to support his breach of warranty claims, the Court will enter summary judgment in favor of the Defendants on Count II of Plaintiff's Complaint. Accordingly, the Court's analysis will focus on Plaintiff's Count I claims of negligent/defective design and manufacture and failure to warn.

## D. THE NON–MANUFACTURING SELLERS CANNOT BE HELD LIABLE FOR NEGLIGENT/DEFECTIVE DESIGN OR MANUFACTURE

It is undisputed that the Flexo–Folder–Gluer machine at issue in this action was designed and manufactured by Curioni, S.p.A. *See* Plaintiff's First Amended Complaint, ¶ 15, 16. Defendants General Corrugated Machinery, Acme Corrugated Box Co., and Hampton Industrial Services did not participate in the design or manufacture of the machine or any of its components.[10] *See* First Amended Complaint,

---

**10.** A fifth Defendant, Sun Automation, allegedly manufactured one of the components, the feeding mechanism, in the machine. [*See* First Amended Complaint, ¶ 20.] Sun Automation has not filed a dispositive motion.

¶¶ 17–19 ("General Corrugated represents Defendant Curioni... as its United States sales agent"; "Defendant Acme sold the press to Plymouth Packaging"; "The subject press was installed at Plymouth Packaging by Defendant Hampton.")

Under Michigan's tort reform law, a seller, who is not a manufacturer, is only liable for any harm allegedly caused by the product if:

(a) The seller failed to exercise reasonable care, including breach of any implied warranty, with respect to the product and that failure was a proximate cause of the person's injuries; or

(b) The seller made an express warranty as to the product, the product failed to conform to the warranty, and the failure to conform to the warranty was a proximate cause of the person's harm.

M.C.L. § 600.2947(6)(a), (b).

Michigan's tort reform provision has been in effect for more than three years, yet few reported decisions have substantively addressed the issue of a seller's liability under the statute. The plain language of the statute, however, predicates a seller's liability on (a) its failure to exercise "reasonable care" or (b) its breach of an implied or express warranty. As the Sixth Circuit noted in *Hollister v. Dayton Hudson Corp.*, 201 F.3d 731 (6th Cir.2000), the former is a tort action and the latter is an action for breach of contract.

Michigan courts, however, have not directly addressed the foundational question of what constitutes the scope and extent of a seller's duty to exercise "reasonable care" under the tort aspect of the statute. The legislative history of Section 2947 reveals the Legislature's intent to limit the liability of sellers only to those cases where their independent negligence is shown. The Senate Fiscal Agency's report on the product liability measures of Michigan's tort reform legislation explains:

By holding sellers responsible for their own wrongdoing, the bill would eliminate unnecessary and burdensome legal costs and insurance premiums. Since manufacturers ultimately indemnify sellers for the harm caused by the manufacturers' own products, claims should be brought directly against them.

[Senate Fiscal Agency Analysis of S.B. 344, p. 10.]

█ It is well-established that the primary goal of judicial interpretation of statutes is to give effect to the intent of the Legislature. *See In re Messer Trust*, 457 Mich. 371, 379–80, 579 N.W.2d 73 (1998).

The Sixth Circuit has held that to establish a seller's "independent negligence" under the Michigan statute requires proof that the seller knew or had reason to know the product was defective. *See Hollister, supra*, 201 F.3d at 736. In *Hollister*, the appellate court affirmed the district court's summary disposition of the plaintiff's negligence claim against the seller of an allegedly defectively designed shirt because she "failed to offer any evidence of negligence on Dayton Hudson's part, such as proof that the retailer knew of the shirt's extreme flammability or that it had received consumer complaints about the shirt in the past." *Id.*

That the statute should be read to require a plaintiff to prove that the seller knew or had reason to know of a products defect finds further support in *Warner v. General Motors Corp.*, 137 Mich.App. 340, 346, 357 N.W.2d 689, 693–94 (1984), a pre-tort reform decision.

In *Warner*, the plaintiff sued a car dealership and manufacturer for injuries incurred when the automobile he had purchased backfired while he was repairing it. Warner had bought a new Chevy Vega, which came with a "do-it-yourself" repair manual, from a GM dealer. Two years after the purchase of the car, it apparently

stopped running, and in an attempt to restart it, Warner attempted to "prime" the car by pouring gasoline into the carburetor. The carburetor backfired. The backfire ignited Warner's shirt, causing him to dive into a lake in an attempt to put out the fire, and when he dove into the lake, he broke his neck rendering him a quadriplegic. Apparently Warner had tripped an oil pressure switch at an earlier date while changing the oil in the car. The oil pressure switch was a safety device intended to stop the flow of gasoline into the engine when the oil pressure became too low. The information about the switch was not included in the do-it-yourself repair manual.

Warner proceeded against GM on a negligence/failure to warn theory as well as breach of an implied warranty. The jury found the manufacturer, General Motors, negligent, but ultimately found that its negligence was not a proximate cause of injury. The jury also found that the dealership was not negligent and did not breach any implied warranties.

On appeal, Warner unsuccessfully argued that the trial court improperly charged the jury that plaintiffs were required to prove that any defect in the product was known to, or readily ascertainable by, the seller. The jury instruction stated in part that the defendant dealership "owed a duty to plaintiffs to protect and/or warn for any known or visible defects that were readily ascertainable; [but] ... owed no duty for any defects that were hidden or unknown to the seller." *Warner* at 693. The Michigan Court of Appeals found that the jury instruction accurately set forth a seller's duty. *Id.*

■ Failure to warn claims are also instructive in determining a seller's duty.

Under Michigan law, to establish that a product is defective due to failure to warn, a plaintiff must show that a manufacturer or seller:

1) had actual or constructive knowledge of the alleged danger;

2) had no reason to believe that consumers would know of this danger, and

3) failed to exercise reasonable care to inform consumers of the danger.

*Peck v. Bridgeport Machines, Inc.,* 237 F.3d 614, 619 (6th Cir., 2001).

■ Based upon the foregoing, the Court finds that a seller's duty under Section 2947 is based on whether it knew or should have known of the alleged danger.

■ Plaintiff has proffered no evidence to show that Curioni's U.S. sales agent, General Corrugated, or Acme Corrugated Box Company, the ultimate seller here, knew or had reason to know that Curioni's product was defective. The issue of knowledge is particularly significant here given the fact that for six years after manufacture, the machine was used by Acme apparently without incident before it was sold to Plaintiff's employer.[11] As the Supreme Court made clear in *Anderson v. Liberty Lobby, supra,* when faced with a motion for summary judgment, the respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat" the motion. 106 S.Ct. at 2514. *See also, Street v. J.C. Bradford & Co., supra,* 886 F.2d at 1479.

Plaintiff has been afforded more than ample opportunity to complete discovery and to respond to Defendants' Motions with sufficient affirmative evidence to support his claims against the sellers. How-

11. Furthermore, Plaintiff himself used this machine for approximately three weeks prior to his accident without incident and he used a substantially similar machine at Plymouth Packaging for approximately 18 months without incident.

ever, he has failed to do so. Therefore, based upon the foregoing discussion, the Court will enter summary judgment in favor of Defendants General Corrugated Machinery and Acme Corrugated Box Company.[12]

### E. PLAINTIFF HAS FAILED TO ESTABLISH ANY CAUSAL CONNECTION BETWEEN THE ACTIONS OF DEFENDANT HAMPTON INDUSTRIAL AND PLAINTIFF'S INJURY

■ As discussed above, Hampton Industrial Services was the entity that was hired by Plaintiff's employer, Plymouth Packaging, to travel to Bensalem, Pennsylvania, disassemble, load and ship the Flexo–Folder–Gluer machine to Plymouth, Michigan, and unload, re-assemble and install the machine at Plymouth Packaging's plant. Hampton, thus, was not either a manufacturer or seller of the machine at issue, and, therefore, was not in a position to install the safety mechanisms Plaintiff claims were lacking on the machine or to provide Plaintiff with warnings as to any dangerous condition.

Apparently, Plaintiff's theory is that because Hampton "assembled" the machine

at Plymouth Packaging, the Court should treat this entity as a manufacturer for purposes of this product liability action.[13] However, even assuming arguendo that this is a valid theory under which Plaintiff may proceed against Hampton, the evidence of record does not support such a claim.

Robert Hampton, the owner of Hampton Industrial Services and the person responsible for the moving of the Curioni machine from Acme's facility in Pennsylvania to Plymouth Packaging, testified in his deposition at length as to his "disassembly" and "re-assembly" of the machine. He testified that the feeder system was not disassembled; rather the entire feeder unit was moved in one piece:

Q [by Plaintiff's counsel]: When you disassembled the machine in Pennsylvania, tell me what you had to do in order to deal with the feed system.

A: Dewire the feed system, then apply lifting eyes to the machine, which will enable me to pick the feed system off the track. The feed system is not mechanically attached in any way to the floor; in other words, it rolls up and down on bearings. It's a matter of pick-

---

12. Although Plaintiff has incorporated in his product liability claim in Count I allegations of both negligence and failure to warn, as indicated above, in order to establish a failure to warn claim under Michigan law, the plaintiff must establish that the defendant knew or had reason to know of the alleged dangerous condition and had no reason to believe that the plaintiff would know of the danger. See Peck v. Bridgeport Machines, Inc., supra 237 F.3d at 619. See also, M.C.L. § 600.2948. Plaintiff has produced no evidence to establish such knowledge on the part of Defendants General Corrugated or Acme. And, even assuming arguendo that Plaintiff has presented sufficient evidence of the sellers' knowledge, as discussed infra, Plaintiff's failure to warn claim as to all of the Defendants fails as a matter of law by application of the "sophisticated user" doctrine. Therefore, summary

judgment will also be entered in favor of the seller-defendants on Plaintiff's failure to warn claim, as well.

13. Michigan law defines a "product liability action" as

"an action based on a legal or equitable theory of liability brought for the death of a person or for injury to a person or damage to property caused by or resulting from the production of a product."

M.C.L. § 600.2945(h). Subsection 2945(i) defines "production" as

"manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, inspection, testing, listing, certifying, warning, instructing, marketing, selling, advertising, packaging or labeling."

ing it up and walking off with it, with a forklift or crane.

\* \* \* \* \* \*

Q: Mr. Hampton, I'm going to have you take a look at what has been marked as Exhibit Number 5. Is this one of the photographs depicting the feeder system...?

A: Yes.

Q: Can you tell me what was involved in disassembling the feeder system you see in that photograph.

A: I didn't disassemble the feeder system. I merely took the feeding unit off the track and put it on a trailer....

\* \* \* \* \* \*

Q: This entire, for lack of better term, U-shaped box that sits on top of the roller feeder system... [d]id that whole U-shaped box unit come off the top of the machine?

A: No. No.

Q: The entire machine, the front of the machine that is depicted in that photograph, was that moved in one piece?

A: Entire—one entire unit.

Q: So this whole white box that we see—in the photograph was moved intact from Philadelphia to Michigan, just as we see it in the picture here?

A: Yes, sir.

\* \* \* \* \* \*

Q:.... [T]here were no changes or modifications don to the roller feeder system between the time the machine left Acme in Pennsylvania and when your company reinstalled it here in Michigan?

A: No...

[Hampton Dep., Hampton Ex. G, pp. 21–25]

In *Skinner v. Square D Co.*, 445 Mich. 153, 162–163, 516 N.W.2d 475 (1994), the Michigan Supreme Court explained that proof of proximate cause "actually entails proof of two separate elements: (1) cause in fact, and (2) legal cause, also known as 'proximate cause.'" The "cause in fact" element generally requires showing that "but for" the defendant's actions, the plaintiff's injury would not have occurred. *Id.* (citing Prosser & Keaton, Torts (5th ed.), § 41, p. 266.) "Proximate cause," on the other hand, normally involves examining the foreseeability of consequences, and whether the defendant should be held legally responsible for such consequences. *Id.* (citing *Moning v. Alfono,* 400 Mich. 425, 439, 254 N.W.2d 759 (1977)). A plaintiff must adequately establish cause in fact in order for legal cause or proximate cause to become a relevant issue. *Id.* This does not mean that the plaintiff must eliminate all other possible causes for his injury. As the *Skinner* court explained:

All that is necessary is that the proof amount to a reasonable likelihood of probability rather than a possibility. The evidence need not negate all other possible causes, but such evidence must exclude other reasonable hypotheses with a fair amount of certainty. Absolute certainty cannot be achieved in proving negligence circumstantially; but such proof may satisfy where the chain of circumstances leads to a conclusion which is more probable than any other hypothesis reflected by the evidence. However, if such evidence lends equal support to inconsistent conclusions or is equally consistent with contradictory hypotheses, negligence is not established.

445 Mich. at 166, 516 N.W.2d at 481.

Robert Hampton's deposition testimony—which is uncontroverted—makes it clear that Plaintiff Mills cannot establish factual cause with respect to Hampton Industrial Services. Plaintiff has pled his product liability claim of negligent design and manufacture against the Defendants collectively. As indicated, his theory appears to be that the Flexo–Folder–Gluer

machine should have had guards of some sort on the sides of the feeder loading area and over the vacuum portion of the feeder to protect against the possibility of an operator who is loading stock into the feeder of getting his hand or fingers near the feeder roller area. [*See* Deposition of Plaintiff's expert, Samuel Sero, pp. 48–52.] However, Hampton Industrial Services had nothing to do with the design or manufacture, or even sale, of the machine, and as Robert Hampton testified, he did *nothing* to the feeder unit of the machine, other than to physically move the unit—entirely intact—from Pennsylvania to Michigan and install it at Plymouth Packaging without any alteration or modification. Plaintiff has presented no evidence from which it might be ascertained that Hampton Industrial's moving of the machine from Pennsylvania to Michigan in any way "caused" his injuries. Therefore, Hampton's Motion for Summary Judgment will be granted.[14]

## F. *DEFENDANT CURIONI'S LACK OF PROXIMATE CAUSE, "OPEN AND OBVIOUS DANGER" AND "SOPHISTICATED USER" ARGUMENTS*

■ Relying on Plaintiff's deposition testimony, Defendant Curioni, S.p.A., the manufacturer of the Flexo–Folder–Gluer machine, has also moved for summary judgment contending that Plaintiff cannot establish a *prima facie* case of negligence or failure to warn where he admitted in his deposition that the risk of injury was open, obvious and a matter of common sense. Curioni further argues that it had no duty to warn Plaintiff of any risk of injury because Plaintiff was a "sophisticated user" of the machine. Curioni also argues that Plaintiff cannot establish that any de-

sign defect, i.e., any lack of guards, was the proximate cause of his injury.

Beginning first with this last argument of lack of proximate cause, Curioni relies upon the following excerpts from Plaintiff's deposition as support for its argument:

Q: Why did you get hurt?

A [by Plaintiff]: The reason why I think I got hurt 'cause I don't know why I got hurt. When I went to wipe it [the debris] off, it must have—either the glove or something might have extended—not extended, but you know, it might have been like that when I went to wipe it up. I think it [the feeder] grabbed the glove and pulled my hand through. I remember wiping it [the debris] off the right side and I remember just like this. And before I got a chance to wipe it all off, I felt my hand go in the machine.

\*　　\*　　\*　　\*　　\*　　\*

Q: You said, as I understand it, there was stock buildup that was on the right-hand side that caused you to push it away and that's how the accident happened; is that right?

A: Yes.

[Mills Dep, pp. 95, 226]

Apparently, Curioni's argument is that Plaintiff's action in wiping the debris off of the side of the feeder was what "caused" his injury. However, as indicated above, the Michigan Supreme Court made clear that to establish proximate cause, the plaintiff need not eliminate all possible causes; "[a]ll that is necessary is that the proof amount to a reasonable likelihood of probability rather than a possibility." *Skinner, supra.* Plaintiff here has proffered the deposition testimony of his expert, Samuel Sero, who has opined that if

---

14. Similarly, Plaintiff has presented no evidence to support a claim of failure to warn against Hampton. And, as noted above, this claim fails as a matter of law as to all Defen-

dants by application of the "sophisticated user" rule. *See* discussion of the "sophisticated user" doctrine in Section F, *infra*.

guards were placed at the sides of the feeder loading area and over the vacuum portion of the feeder, they would have prevented Plaintiff's gloved-hand from being pulled into the feeder rollers. Plaintiff, thus, has presented sufficient evidence to withstand summary judgment on Defendant Curioni's lack of proximate cause claim.

■ Turning then to Curioni's "sophisticated user" and "open, obvious and a matter of common sense" arguments, as provided in Michigan's product liability statutes:

> Except to the extent a state or federal statute or regulation requires a manufacturer to warn, a manufacturer or seller is not liable in a product liability action for failure to provide an adequate warning if the product is provided for use by a sophisticated user.

M.C.L. § 600.2947(4).

"Sophisticated user" is defined as:

> "a person or entity that, by virtue of training, experience, a profession, or legal obligations, is or is generally expected to be knowledgeable about a product's properties, including a potential hazard or adverse effect. An employee who does not have actual knowledge of the product's potential hazard or adverse effect that caused the injury is not a sophisticated user."

M.C.L. § 600.2945(j).

Michigan statutory law further provides:

> A defendant is not liable for failure to warn of a material risk that is or should be obvious to a reasonably prudent product user or a material risk that is or should be a matter of common knowledge to persons in the same or similar position as the person upon whose injury

or death the claim is based in a product liability action.

M.C.L. § 600.2948(2).

Plaintiff Mills had more than 18 months experience operating flexo-folder-gluer machines. He testified in his deposition that he knew of the risk of getting hurt by the rollers on the machine:

Q: Did the operator [who trained you] ever tell you where to and not to put your hand when wiping away the scrap?

A: No.

Q: So you made the decision where to put your hand when you were wiping away the scrap?

A: Yes.

\*    \*    \*    \*    \*    \*

Q: *How did you learn about any places where you might get hurt on that machine?*

A: ***It was obvious to me*** *if I put my hand up to the pinch point, yes I will get hurt.*

\*    \*    \*    \*    \*    \*

Q: Do you know what a pinch point is?

A: Yes.

\*    \*    \*    \*    \*    \*

Q: And it's your job to act safely and keep your hands away from those pinch points, right?

A: Yes.

\*    \*    \*    \*    \*    \*

Q: *What is your definition or understanding of the term "pinch point?"*

A: *A point where pinching and will pull you through the machine or pull you through, you know.* ***It's a dangerous spot.***

Q: *And clearly you knew and understood that the roller area was what you described or defined as a pinch point?*

A: *Yeah.*

[Mills Dep. pp. 40–47; 60–61; 64–65; 231 (emphasis added)].

The issue of whether a defendant owes a plaintiff an actionable duty is a question of law to be decided by the court. *Antcliff v. State Employees Credit Union*, 414 Mich. 624, 327 N.W.2d 814 (1982); *Moning v. Alfono, supra.* A manufacturer may be held liable for a failure to warn purchasers or users of its products about dangers associated with intended uses and also foreseeable misuses. *Antcliff, supra.* However, there is no duty to warn or protect against obvious dangers. *Fisher v. Johnson Milk Co.*, 383 Mich. 158, 174 N.W.2d 752 (1970).

As explained by the Michigan Supreme Court in *Glittenberg v. Doughboy*, 441 Mich. 379, 491 N.W.2d 208 (1992), the issue of the "obvious" nature of a danger is an objective standard, not a subjective one. The court explained:

> Determination of the "obvious" character of a product-connected danger is objective. The focus is the typical user's perception and knowledge and whether the relevant condition or feature that creates the danger associated with the use is fully apparent, widely known, commonly recognized, and anticipated by the ordinary user and consumer.

*Id.* at 391–92, 491 N.W.2d 208.

Defendant Curioni contends that because Plaintiff has admitted that he was aware of the danger of getting his hand caught in the pinch point of the roller area of the machine and because he admitted that it was "obvious" to him that he would get hurt if he put his hand up to the pinch point, it is entitled to summary judgment on both Plaintiff's design defect and failure to warn claims by application of the "open and obvious danger" rule. In support of its claim, Defendant relies upon *Bullock v. Gulf & Western Mfg.*, 128 Mich.App. 316, 340 N.W.2d 294 (1983), a product liability case involving a machine press.

In *Bullock,* the plaintiff whose hand was injured was an experienced operator of the machine on which he was injured. Bullock also testified in his deposition, like Plaintiff Mills did here, that he was aware of the dangers associated with the point of operation of the machine he was working with. Defendant maintains that this case demonstrates that applicability of the "open and obvious danger" rule is not limited to "simple tools," but rather that it also can apply to complex machines with operating parts. However, *Bullock* only supports Curioni's position with respect to Plaintiff's failure to warn claim, not his claim of defective design. *See* 128 Mich.App. at 322–323, 340 N.W.2d 294

The Michigan Supreme Court made clear in *Glittenberg, supra,* that with respect to design defect claims, the open and obvious danger rule does not apply:

> We have also narrowed application of the no-duty rule to those cases involving "simple tools or products." *Owens v. Allis–Chalmers Corp.*, 414 Mich. 413, 326 N.W.2d 372 (1982). We have rejected the proposition that the "open and obvious danger" rule is an incantation that obviates the threshold inquiry of duty in design defect cases.

*Glittenberg, supra,* at 393–94, 491 N.W.2d 208.

It is only when a "simple tool" is involved that the "open and obvious danger" rule will relieve a manufacturer of liability on a design defect claim. *See Kirk v. Hanes*, 16 F.3d 705 (6th Cir.1994). *See also, Treadway v. Smith & Wesson Corp.*, 950 F.Supp. 1326 (E.D.Mich.1996) ("The Sixth Circuit in *Kirk* has determined that in Michigan the 'open and obvious danger' rule applies in both failure to a warn and design defect products liability cases **where the product is a simple tool.**" *Id.* at 1331.) This difference in the scope of applicability of the "open and

obvious danger" doctrine was explained by the court in *Inman v. Heidelberg Eastern, Inc.*, 917 F.Supp. 1154 (E.D.Mich.1996).

*Inman* involved a product liability claim against the manufacturer of a printing press. The plaintiff, an experienced operator of the press, was injured when he reached across the press to check the pressure ("bounce") on the rollers. His arm got caught in an unguarded running "nip point" of the rollers resulting in the near amputation of his arm. *Id.* at 1156.

Inman subsequently brought suit alleging that the press was defective because the manufacturer failed to install proper safety devices to protect the operator from injury. The manufacturer argued that because the danger of the press was open and obvious, it had no duty to make the press more safe because it was a simple tool and the danger to be avoided was open and obvious to all. *Id.* at 1157–58. The court rejected both arguments.

The court first addressed the "simple tool" argument:

> The court finds it absurd that HD is seriously attempting to argue that the printing press was a simple tool....
>
> The two part test for determining whether a tool is considered a simple tool under the law is: (1) the product is not highly mechanized, allowing user control; and (2) the intended use of the product does not place the user in an obviously dangerous position. [Citation omitted.] HD admits that the press is mechanized, but argues that a simple tool does not become complex merely because it is mechanized. HD spends significant effort arguing that tool need only meet one prong of this two part test to be considered a simple tool.... However, HD also admitted that checking the bounce required placing the operator's hand within seven inches of an unguarded in-running nip point. The

court cannot see how HD can argue that this is not dangerous.

*Id.* at 1158.

The *Inman* court then went on to address, and reject, the defendant's "open and obvious danger" argument:

> HD also argues that the danger of the press was open and obvious and therefore HD did not need to make the press more safe. In *Kirk v. Hanes*, 16 F.3d 705 (6th Cir.1994), the court explained that under Michigan law, manufacturers of simple tools do not have any duty to warn or protect against dangers which are obvious to all. *Id.* (quoting *Fisher*, 383 Mich. 158, 174 N.W.2d 752 (1970)). The Sixth Circuit explained that a "manufacturer cannot manufacture a knife that will not cut or a hammer that will not mash a thumb or a stove that will not burn a finger." *Id.* However, because the press is not a simple tool, the manufacturer's duty to protect operators of open and obvious dangers is not obviated in design defect claims. In *Glittenberg*, 441 Mich. 379, 393, 491 N.W.2d 208 (1992), the court stated:
>
> > Our jurisprudence recognizes the well established rule that there is no duty to warn of dangers that are open and obvious. *We have also narrowed application of the no-duty rule to those cases involving "simple tools or products."* Owens v. Allis–Chalmers Corp., 414 Mich. 413 [326 N.W.2d 372] (1982). We have rejected the proposition that the "open and obvious danger" rule is an incantation that obviates the threshold inquiry of duty in design defect cases.

*Glittenberg*, 441 Mich. at 393, 491 N.W.2d 208 (emphasis added). **HD argues that the open and obvious doctrine has been applied to mechanized products. However, in the three cases cited by HD for this proposition, the**

court applied the open and obvious danger doctrine to plaintiffs' failure to warn claims and not to the defective design claims. *Bullock v. Gulf & Western Manufacturing*, 128 Mich.App. 316, 340 N.W.2d 294 (1983); *Wiegerink v. Mitts & Merrill*, 182 Mich.App. 546, 452 N.W.2d 872 (1990), *lv. app. den.* (1990); *Reeves v. Cincinnati*, 176 Mich. App. 181, 439 N.W.2d 326 (1989).

917 F.Supp. at 1158–59 (emphasis added).

The foregoing makes clear that Curioni cannot escape liability on Plaintiff's claim of defective design by application of the "open and obvious danger" rule. However, as *Bullock* demonstrates, the doctrine does apply with respect to a failure to warn claim where, as here, the Plaintiff testified that he was aware of the danger of getting his hand caught in the pinch point of the roller area of the machine and that it was "obvious" to him that he would get hurt if he put his hand up to the pinch point. Based on the foregoing discussion, the Court finds that, by application of Michigan's "open and obvious danger" rule, Curioni had no duty to warn Plaintiff of the danger associated with its machine.

■ However, even if the Court were to find that the open and obvious danger doctrine did not apply here, the Court would nonetheless find that Curioni was entitled to summary judgment on Plaintiff's failure to warn claim by application of the "sophisticated user" rule. Curioni claims that Plaintiff falls within the statutory definition of "sophisticated user", as he is "a person... that by virtue of training [or] experience... is, or is generally expected to be knowledgeable about a product's properties, including a potential hazard or adverse effect." M.C.L. § 600.2945(j).

Although Curioni frames the "sophisticated user" argument in its Motion by asserting that the Court should find that it owed no duty to warn Plaintiff because *Plaintiff* himself was a sophisticated user, the Court believes that the defense here would be more appropriately phrased by arguing that Plaintiff's *employer* was a sophisticated user.[15]

■ It is well-settled in Michigan that, where a *purchaser* is a "sophisticated user" of a manufacturer's product, the purchaser is in the best position to warn the ultimate user of the dangers associated with the product, thereby relieving the sellers and manufactures from the duty to warn the ultimate user. *See Antcliff v. State Employees Credit Union*, 414 Mich. 624, 640, 327 N.W.2d 814 (1982); *Ross v. Jaybird Automation, Inc.*, 172 Mich.App. 603, 607, 432 N.W.2d 374 (1988); *Jodway v. Kennametal, Inc.*, 207 Mich.App. 622, 627–29, 525 N.W.2d 883 (1994); *Rasmussen v. Louisville Ladder Co., Inc.*, 211 Mich.App. 541, 547–48, 536 N.W.2d 221 (1995); *Portelli v. I.R. Construction Products Co.*, 218 Mich.App. 591, 599, 554 N.W.2d 591, 596 (1996).

The rationale behind absolving manufacturers of the duty to warn in this context was explained by the Michigan Court of Appeals in *Portelli:*

The cases suggest that a duty to warn a purchaser of the inherent dangers of a product does not arise in a situation where the purchase is a sophisticated user because a sophisticated user is charged with knowledge of the product. The rationale behind the sophisticated-user doctrine is that the manufacturer

---

**15.** Indeed, Defendant Curioni as well as all of the other Defendants phrased their "sophisticated user" affirmative defense by asserting that Plaintiff **and/or** his employer was a sophisticated user. [*See* Curioni's Affirmative Defense 17; General Corrugated's Affirmative Defense 15; Acme's Affirmative Defense (P); Hampton's Affirmative Defense 16; and Sun Automation's Affirmative Defense 17.]

markets a particular product to a class of professionals that are presumed to be experienced in using and handling the product. Because of this special knowledge, the sophisticated user will be relied upon by the manufacturer to disseminate information to the ultimate users regarding the dangers associated with the product. Hence, the manufacturer is relieved of a duty to warn.

218 Mich.App. at 601, 554 N.W.2d at 597.

The "sophisticated user" doctrine has been applied in product liability cases involving machine injuries similar to Plaintiff' injury in this case. For example, in *Miller v. E.W. Bliss Co., Inc.*, 2000 WL 33521872 (Mich.App., Mar.14, 2000), the plaintiff was injured while at his job with Stramco, Inc., when his hand was caught in press manufactured by Bliss Company. The trial court granted Bliss's motion for summary disposition on plaintiff's claims of negligent design and failure to warn. The Michigan Court of Appeals affirmed.

In affirming the grant of summary disposition on Miller's failure to warn claim, the Court of Appeals explained:

> [A] manufacturer is relieved of its duty to warn the ultimate user where the purchaser of the product is a sophisticated user, who is experienced in using and handling the product. [Citation omitted]. Here, Stramco was experienced in the use of presses and was in a better position to warn plaintiff of the dangers associated with operating the press.... Under these circumstances, Bliss was relieved of any duty to warn plaintiff about the dangers of operating the press.

*Id.* at *5. *See also, Carpenter v. Rust*, 25 F.3d 1047, 1994 WL 198191 (6th Cir.1994) (unpublished decision; text available on WESTLAW) (applying Michigan law) (be-

cause plaintiff's employer was a sophisticated user the manufacturer had no duty to warn of the dangers of its product and summary judgment was accordingly properly entered on plaintiff's failure to warn claim); *Koern v. Pentek Corp.*, 142 F.3d 434, 1998 WL 96583 (6th Cir.1998) (to like effect).

In this case, the Curioni Flexo–Folder–Gluer machine was sold to Plymouth Packaging. Plymouth Packaging was an experienced producer of cardboard boxes and, in fact, prior to purchasing the Curioni machine had for a number of years used a very similar flexo-folder-gluer machine. Being experienced in the production of cardboard boxes and the use of flexo-folder-gluer machines, Plymouth Packaging was in the best position to warn its employees of the dangers associated with the machine. Furthermore, it was Plymouth Packaging's decision to have its employees wear gloves while operating the machines.[16] Under these circumstances, neither Curioni, nor any of the other manufacturer and non-manufacturer Defendants, owed a duty to Plaintiff to warn him of the risks and dangers of the machine.

For these reasons, summary judgment will be entered in favor of all of the Defendants, including Curioni, S.p.A., on Plaintiff's failure to warn claim in Count I of his Complaint.

## CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that summary judgment be, and hereby is, entered in favor of all of the Defendants on Plaintiff's failure to warn claim in Count I of the First Amended Complaint, and Plaintiff's failure to warn claim, accordingly, is dismissed with prejudice.

---

**16.** Plaintiff testified that the gloves were intended to provide workers with a better grip of the cardboard materials that were fed into the machines to make the boxes. After Plaintiff's accident, Plymouth rescinded the directive that employees wear gloves.

IT IS FURTHER ORDERED that summary judgment be, and hereby is, entered in favor of Defendants General Corrugated Machinery, Acme Corrugated Box Company and Hampton Industrial Services on Plaintiff's defective design and manufacture claim in Count I of his First Amended Complaint. Accordingly, Plaintiff's defective design and manufacture claim is dismissed with prejudice as to these three Defendants, only.

IT IS FURTHER ORDERED that Plaintiff's breach of warranty claims in Count II of the First Amended Complaint are dismissed with prejudice.

This case, accordingly, will proceed to trial only on Plaintiff's claims of defective design and manufacture against Curioni, S.p.A. and Sun Automation.

SO ORDERED.